[No. A086591. First Dist., Div. Four. Dec. 18, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
WANJIKO HARDIN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III of the Review.

**COUNSEL**

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Eric D. Share and Linda M. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WOOLARD, J.**[*]—Appellant Wanjiko Hardin was convicted by a jury of second degree murder of a victim over 60 years of age with personal use of a deadly weapon (Pen. Code, §§ 187, 1203.09, subd. (a), 12022, subd. (b)).[1] After admitting two prior convictions for drug-related felonies, defendant was sentenced to state prison for a total term of 17 years to life.

The Attorney General's brief has an effective abbreviation of the essential facts of the offense. Having verified its accuracy, we adopt it as our own: "During the morning of April 13, 1996, appellant ingested cocaine. While riding as a passenger in his cousin Eric Davis's car, appellant became involved in a physical altercation with Davis. After rear-ending a car, Davis drove to a residential intersection in Berkeley, where he and appellant continued to struggle. Appellant ran into the home of 79-year-old Lucille Levingston, who had been standing on her porch. A few minutes later, the police arrived, knocked on the door, and announced themselves. Appellant responded by threatening to kill Levingston. Straddling Levingston, he hit her repeatedly on her head and upper torso with a claw hammer. Police entered the home and tackled appellant, who yelled, 'they're trying to kill me; I gotta kill 'em.' After wrestling the hammer from appellant, the police

---

[*]Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, § 6 of the California Constitution.

[1]Statutory references are to this code unless otherwise indicated.

handcuffed him. As he was escorted to the patrol car, appellant yelled, 'they're trying to kill me'; 'I hate all of you'; 'I hate all cops'; and 'Oakland police brutality.' . . . The officers and responding paramedics believed that he was under the influence of cocaine or another stimulant. Levingston died two weeks later from complications of the attack.

"The defense argued that appellant was guilty of manslaughter, not murder. Appellant testified that he had ingested cocaine and feared people were after him. Three medical doctors testified that appellant experienced a cocaine-induced psychosis that day. The defense argued that appellant's ingestion of cocaine rendered him psychotic and unconscious at the time of the murder and that he acted in imperfect self-defense."

Specific evidence will be discussed as needed hereafter.

REVIEW

I

The primary issue presented here is whether a number of instructions concerning a resident's right of self-defense impinged on defendant's assertion of imperfect self-defense against a charge of murder.

The trial court instructed the jury with CALJIC Nos. 5.17, 5.40, and 5.42 as follows:

"A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual, but unreasonable belief is not a defense to the crimes of voluntary or involuntary manslaughter. [¶] As used in this instruction, an 'imminent' peril means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer. [¶] However, this principle is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force. The only unlawful or wrongful conduct that would apply in this case would be an unlawful and forcible entry into the residence of Lucille Levingston.

"This instruction applies to define and describe the law concerning trespassers and the use of force concerning a trespasser as described in the last

paragraph of the previous instruction. [¶] The lawful occupant of a residence has the right to request a trespasser to leave the premises. If the trespasser does not do so within a reasonable time, the occupant may use reasonable force to eject the trespasser. [¶] The amount of force which may be used to eject a trespasser is limited by what would appear to a reasonable person, under existing circumstances, to be necessary to prevent damage to the property or physical injury or death to the occupant.

"A person may defend his or her home or habitation against anyone who manifestly intends or endeavors in a violent or riotous manner, to enter that home or habitation and who appears to intend violence to any person in that home. The amount of force which the person may use in resisting such trespass is limited by what would appear to a reasonable person, in the same or similar circumstances, necessary to resist the violent or unlawful entry. The resident of the home is not bound to retreat even though a retreat might safely be made. He or she may resist force with force, increasing it in proportion to the intruder's persistence and violence if the circumstances which are apparent to the lawful occupant of the property are such as would excite similar fears and a similar belief in a reasonable person."

Defendant presents an extended discussion as to how these instructions lapsed into error. The essence of defendant's contention is based on two expressions from our Supreme Court. Before exploring those statements, some general principles of homicide and self-defense will assist comprehension.

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable. . . . [F]or either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1], fn. omitted.) "The principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related rules . . . . First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an

attack which is in itself deadly or likely to cause great bodily injury . . . . Under these two principles a person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that the nature of the attack did not justify the resort to deadly force or that the force used exceeded that which was reasonably necessary to repel the attack. [Citations.]" (*People v. Clark* (1982) 130 Cal.App.3d 371, 380 [181 Cal.Rptr. 682].)

The first of defendant's sources is from 1994: "It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. (See generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 245, p. 280; 2 Robinson, Criminal Law Defenses (1984) § 131(b)(2), pp. 74-75.) It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine will not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 [30 Cal.Rptr.2d 33, 872 P.2d 574].)[2]

The second is from 1895: "Where one is the first wrongdoer, but his unlawful act is not felonious, as a simple assault upon the person of another, or a mere trespass upon his property, even though forcible, and this unlawful act is met by a counter assault of a deadly character, the right of self-defense to the first wrongdoer is not lost. For, as his acts did not justify upon the part of the other the use of deadly means for their prevention, his killing by the other would be criminal, and one may always defend himself against a criminal attempt to take his life. But in contemplation of the weakness and

---

[2]After defendant repeatedly cited *Christian S.*—particularly its footnote 1—in his opening brief, the Attorney General responded that the *Christian S.* footnote "is binding here, per *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]." Defendant backtracked a bit in his reply brief, insisting that the *Christian S.* footnote is merely nonbinding dicta. We are inclined to agree with defendant; because the specific issue addressed by the Supreme Court was whether certain statutory amendments had abrogated imperfect self-defense (see *In re Christian S.*, *supra*, 7 Cal.4th 768, 771, 783), the discussion in the footnote would appear to constitute dicta. (See, e.g., *People v. Ceballos* (1974) 12 Cal.3d 470, 481 [116 Cal.Rptr. 233, 526 P.2d 241].) Nevertheless, its precise status is not material for present purposes. The authors of one of the treatises cited in the *Christian S.* footnote agree with defendant's initial reading. (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 75, p. 409.) Nothing in the research conducted by the parties or by this court suggests that the expressions in the footnote, even if dicta, are aberrational, ill-considered, or otherwise out of the mainstream of self-defense doctrines.

passions of men, and of the provocation, which, though inadequate, was wrongfully put upon the other, it is the duty of the first wrongdoer before he can avail himself of the plea to have retreated to the wall, to have declined the strife and withdrawn from the difficulty, and to have killed his adversary, under necessity, actual or apparent, only after so doing. If, however, the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense. [Citations.] [¶] The distinction between this principle and the one preceding it consists in this: In the former case the provocation for making a deadly counter attack in self-defense is adequate, and therefore the first aggressor must remove the necessity for it and make that fact known before his own right of self-defense can exist; in the latter case the provocation is inadequate, and if the other by his own unlawful act deprives the first wrongdoer of the opportunity to decline a deadly strife, that fault lies not at the door of the slayer but of the slain." (*People v. Hecker* (1895) 109 Cal. 451, 464 [42 P. 307].)

Defendant does not deny that Ms. Levingston died at his hands. Nor does he claim that he was entitled to invoke the exoneration of perfect self-defense. The argument he makes concerns only imperfect self-defense. That argument, which is subtle and adroitly presented, must be deferred for a moment to examine defendant's evidence concerning what occurred before and after he entered Ms. Levingston's home.

According to defendant, earlier in the day he had seen a man named Remo, who defendant believed was trying to have him killed. While driving with his cousin Davis, defendant had seen another man known as Gator, who defendant believed also wanted him dead. Defendant did not remember the car accident, but once Davis stopped the car in a residential section of Berkeley, defendant now thought that Davis too wanted him dead. Thinking it a place of refuge, defendant ran to Levingston's home and implored her "Help me, they're trying to kill me. Can I use your phone?" When she said nothing and moved to one side, defendant went into the house. Once inside defendant again asked to use the phone. The woman wordlessly pointed to one. While fumbling with the phone, defendant looked through a window and saw a silhouette outside. Hearing a "rustling noise" from the outside of the house,[3] defendant thought "That's them, they [are] coming." He then felt what he called "a hard push" on the back of his head. Defendant turned and saw Ms. Levingston holding an upraised hammer and telling him "I want

---

[3]The silhouette and noise were almost certainly police called to the scene by concerned neighbors who had seen defendant lurch up and into Ms. Levingston's house.

you out of here. I want you out of my house." Defendant asked "Why are you doing this to me? Why are you trying to help them get me?" She responded, "I told you I want you out of my house. Get out of my house. I want you out of here. If you don't get out of here, I will shoot you." According to defendant, "when there was a knock at the door, she looked toward the door and she looked back at me and she said, 'I told you I want you out of my house' and she just came at me with the hammer." It was at this point that defendant "just rushed her." The next thing defendant remembered was being in a police car.

Defendant's argument appears to run as follows: Using language from the *Hecker* excerpt quoted above, he submits that his entry into Ms. Levingston's home was no more than "a mere trespass upon [her] property, even though forcible." Simple trespass, the unauthorized entry of a dwelling, is only a misdemeanor. (§ 602.5.) He did not, within the meaning of the *Christian S.* footnote, initiate a physical assault upon her or commit some other form of felony. One of the treatises cited in the *Christian S.* footnote makes the connection to *Hecker*: "Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force [citation & quote from *Hecker*]." (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Defenses, § 75, p. 410.) He concludes that he did not, solely by reason of his nonfelonious entry, forfeit his right to self-defense because the victim was not entitled to respond to his mere trespass with deadly force. Therefore, the "unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force" language in CALJIC No. 5.17 was unjustified, misleading, and prejudicial to his claim of imperfect self-defense. This reasoning may once have been legally correct, but the law has changed in a crucial respect.

For a goodly number of years California courts had been narrowing the scope of the statutory and common law right to use deadly force. (See *People v. Ceballos*, *supra*, 12 Cal.3d 470, 477-482, and authorities cited.)[4] The principle motivating this evolution was the conviction that "[a]ny

[4]The basic statutory principles are set out in section 197, which provides in pertinent part: "Homicide is . . . justifiable when committed by any person in any of the following cases: [¶] 1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or, [¶] 2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or, [¶] 3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished . . . ."

civilized system of law recognizes the supreme value of human life, and excuses or justifies its taking only in cases of apparent absolute necessity." (*People v. Jones* (1961) 191 Cal.App.2d 478, 482 [12 Cal.Rptr. 777].) To further that aim, courts would examine "the character of the crime, and the manner of its perpetration [citation]. When these do not reasonably create a fear of great bodily harm . . . there is no cause for the exaction of a human life." (*Ibid.*; accord, *People v. Ceballos, supra,* at p. 478.) A dominant consideration in this approach was the *proportionality* of the response to the provocation or threat, thus allowing a weighing of the competing interests. (E.g., 1 LaFave & Scott, Substantive Criminal Law (1986) § 5.7, pp. 649, 651-653; 2 Robinson, Criminal Law Defenses, *supra,* § 131(d), pp. 81-88; Kadish, *Respect for Life and Regard for Rights in the Criminal Law* (1976) 64 Cal. L.Rev. 871, 886-888.)

A significant change in this trend occurred in 1984. The Home Protection Bill of Rights, codified as section 198.5, provides in pertinent part: "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred. . . ." (Stats. 1984, ch. 1666, §§ 1-2, p. 5998.) The legislative history for section 198.5 demonstrates that it was enacted "to permit residential occupants to defend themselves from intruders without fear of legal repercussions, to give 'the benefit of the doubt in such cases to the resident, establishing a presumption that the very act of forcible entry entails a threat to the life and limb of the homeowner.' [Citation.]" (*People v. Owen* (1991) 226 Cal.App.3d 996, 1005 [277 Cal.Rptr. 341].)[5]

■ With respect to defense of habitation, section 198.5 wrought a fundamental shift of emphasis. The use of deadly force by a homeowner is now presumed to be in response to a reasonable fear of imminent deadly danger. (See *People v. Brown, supra,* 6 Cal.App.4th 1489, 1496-1497; *People v. Owen, supra,* 226 Cal.App.3d 996, 1005.) The question of proportionality is thus tilted in favor of the homeowner. Insofar as *People v.*

---

[5] "For section 198.5 to apply, four elements must be met. There must be an unlawful and forcible entry into a residence; the entry must be by someone who is not a member of the family or the household; the residential occupant must have used 'deadly' force (as defined in § 198.5) against the victim within the residence; and, finally, the residential occupant must have had knowledge of the unlawful and forcible entry." (*People v. Brown* (1992) 6 Cal.App.4th 1489, 1494-1495 [8 Cal.Rptr.2d 513].) These requirements may be given to juries with CALJIC No. 5.44 (1998 new) (6th ed. 1996) (Presumption of Fear of Death/Great Bodily Injury), which was not used in this case.

*Hecker, supra,* 109 Cal. 451 can be read as granting home invaders the right of imperfect self-defense to resist attempts at forcible eviction by a residential homeowner, such a construction is no longer tenable in light of section 198.5.

The major focus of defendant's attacks is the final part of CALJIC No. 5.17: "However, this principle [imperfect self-defense] is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force. The only unlawful or wrongful conduct that would apply in this case would be an unlawful and forcible entry into the residence of Lucille Levingston." This instruction was legally correct. When defendant burst into her house, Ms. Levingston would be presumptively justified in fearing that the unlawful entry entailed a threat to her life and safety. She was thus entitled to use force to evict him, force which section 198.5 would make presumptively reasonable. As the jury was instructed by CALJIC Nos. 5.40 and 5.42, defendant had a duty to retreat, but Ms. Levingston did not. As stated in *People v. Hecker, supra,* 109 Cal. 451, 464, defendant was obligated "to have retreated to the wall, to have declined the strife and withdrawn from the difficulty, and to have killed . . . only after so doing." Defendant was not confronted by—as *Hecker* termed it—an "assault . . . so sudden and perilous" that he had "no opportunity . . . to decline or to make known . . . his willingness to decline the strife." Defendant made no effort to retreat, despite the opportunity to do so offered by Ms. Levingston twice ordering him to leave.[6] At that point Ms. Levingston would have been justified in using force (although all she actually did was threaten that use). Because Ms. Levingston had justification, defendant was not, in the terms of *Hecker,* "defend[ing] himself against a *criminal* attempt to take his life." (Italics added.) The entire situation was created by defendant. Her use of force was privileged; defendant's was not. The instructions told this to the jury, and were therefore not erroneous.[7]

---

[6]Once Ms. Levingston had requested defendant to leave her home, the Model Penal Code would allow her to use force to "terminate an unlawful entry or . . . trespass" (Model Pen. Code, § 3.06, subds. (1)(a), (3)(a)).

[7]There is one detail that demands attention. It is clear that at some point after defendant "rushed" Ms. Levingston that he did take the hammer away from her and that he was on his knees straddling her while she was on the floor. Once Ms. Levingston (79 years old, described at 5 feet 3 inches tall and weighing approximately 110 pounds) was disarmed, defendant (who was 22 years old and who is described in the probation report as being 5 feet 11 inches tall and weighing 185 pounds) could no longer entertain the belief that she constituted an *imminent* and *deadly* peril to him. His right to use deadly force in self-defense ended at that moment. (See *People v. Parrish* (1985) 170 Cal.App.3d 336, 352 [217 Cal.Rptr. 700]; *People v. Clark, supra,* 130 Cal.App.3d 371, 380; CALJIC Nos. 5.52 [Self-Defense—When Danger

II, III*

. . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Hanlon, P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied January 8, 2001, and appellant's petition for review by the Supreme Court was denied March 14, 2001. Kennard, J., and Brown, J., were of the opinion that the petition should be granted.

Ceases], 5.53 [Self-Defense Not an Excuse After Adversary Disabled]; 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Defenses, § 76, pp. 410-411.)
   *See footnote, *ante*, page 625.