Filed 12/17/14  P. v. Torres CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIO TORRES,<br><br>    Defendant and Appellant. | A139734<br><br>(Contra Costa County<br>Super. Ct. No. 05-131090-3) |

Defendant Mario Torres appeals his conviction and six-year prison sentence for assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)) with personal infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a)), and battery causing serious bodily injury (Pen. Code, §§ 242, 243, subd. (d)). The conviction is based on an altercation in which defendant punched and seriously injured another man, Rick Hendricks, during a dispute over payment of a debt. Hendricks claimed defendant struck him without warning and defendant claimed that he acted in self-defense. No other person witnessed the exchange. Defendant contends the court erred in admitting evidence of uncharged assaults upon his girlfriend, compounded by the erroneous refusal to give a limiting instruction or to limit the scope of the inflammatory evidence the prosecution was permitted to introduce to refute defendant's denial of the uncharged misconduct. We conclude that as the result of a series of trial court errors, the focus of the trial shifted from the exchange between defendant and Hendricks to defendant's assaults on his girlfriend and that this evidence was wrongly used to prove a

1

disposition to commit violent acts. (Evid. Code, § 1101, subd. (a).) As it is reasonably probable a result more favorable to defendant would have been reached in the absence of the errors, we must reverse the judgment. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

**Statement of Facts**

*Prosecution evidence*

Defendant and Hendricks were acquainted through their girlfriends: defendant's girlfriend Betty Zierke is the daughter of Hendricks's girlfriend. On the day in question, Hendricks was 56 years of age and defendant was 36 years old. The men are about the same height and weight.

Hendricks testified he borrowed $100 from defendant and the men fought when defendant came to Hendricks's home to demand payment. Hendricks said he was not "getting along" with defendant at the time and had previously asked him "not to show up" at Hendricks's house because defendant was having "issues" with Zierke. Hendricks described the "issues" as "Domestic stuff. You know they had arguments and fights and stuff." Hendricks was not present during these arguments.

Prior to the start of trial, defendant made an in limine motion to exclude evidence of prior uncharged criminal acts as unduly prejudicial and improper character evidence. (Evid. Code, §§ 352, 1101.) The court denied the motion, holding that defendant's "reputation for pummeling people" could be admitted to show Hendricks feared him. Consequently Hendricks further testified, over an additional hearsay objection, that defendant "basically assaulted [Zierke]."

Hendricks further testified that the day before the fight, he was at Zierke's apartment to repair a broken bedroom door defendant had "kicked in." Hendricks said he repaired two other doors with similar damage in previous weeks. After repairing the bedroom door, Hendricks said to defendant, referring to the money he borrowed from defendant, that "It looks like this squares us up." Defendant replied, "I don't think so."

On the following afternoon of November 28, 2012, Hendricks was at home playing a video game in his living room when defendant opened the screen door and walked in without knocking. Defendant had been to the house several times before and

2

often let himself in. Hendricks was alone in the living room; his live-in girlfriend was in a bedroom, and his roommate Dave Gregory was in the garage. Hendricks testified that he and defendant engaged in "small talk" before defendant asked "Do you have my money?" Hendricks continued to play the video game and replied, "No, I don't have your money. We're square." Defendant walked out of the house.

Shortly later, Gregory saw defendant standing outside near Hendricks's truck, tapping on the window "with some piece of metal or knife." Gregory testified he did not see an object in defendant's hand but heard metal hitting glass. Gregory told defendant "Don't break the fuckin' window in the truck and don't be doing no fuckin' stupid shit out here." Defendant turned around and walked back in the house. Gregory went in the garage.

According to Hendrick's testimony, defendant reentered the house and again demanded money. Hendricks refused, saying he did not have any money and, if he did, he would give it to Zierke because defendant owed her money. Hendricks testified he stood up, pointed to the door and said, "Get the fuck out of my house," whereupon defendant punched him in the face, striking him in the right eye. Hendricks grabbed defendant and the men "wrestled," first standing then on the floor. Hendricks said defendant may have hit him once more while wrestling and he may have hit defendant. Hendricks called for his roommate to "get this mother fucker off me." Gregory ran from the garage to the living room where he saw defendant on top of Hendricks with a raised fist. Gregory pulled defendant off Hendricks saying, "no more." Defendant "went out the front door." The fight lasted two minutes "at the most." Hendricks admitted regular methamphetamine use but denied using drugs on the day of the fight.

Hendricks was "bleeding profusely." Gregory drove him to the hospital where he stayed for a week. Hendricks suffered a broken nose and permanent damage to his right eye. His eye cannot move within its socket and his vision is blurred and doubled.

Following Hendricks's testimony, defense counsel asked the court for a limiting instruction advising the jury that statements about defendant assaulting Zierke were not admitted for the truth of the matter asserted. The court denied the request: "There's no

3

reason why they would use it for its hearsay purpose, for the truth of the matter of what it asserts. Because the truth of the matter of what it asserts is not an issue. So it's a nonissue." Defense counsel disagreed "that jurors understand that it's not coming in for the truth" but the court said "I don't think [the jury] needs to be told it's not for the truth."

The prosecution's case continued with the testimony of a police officer who spoke to Hendricks at the hospital on the night of the fight. The officer testified he saw no signs that Hendricks was under the influence of methamphetamine. Hendricks told the officer he may have seen a metal object in defendant's hand that "possibly resembled brass knuckles." Hendricks also told the officer that defendant stole money from Zierke, which is why he would not repay defendant. The officer reported that Hendricks also mentioned defendant's "domestic violence issues."

*Defense evidence*

Defendant testified he punched Hendricks in self-defense. He stated that on the day in question he knocked on the door of Hendricks's house. Hendricks's girlfriend answered the door and let him in. Defendant thought Hendricks "might have been drinking" because "[h]e was slurring his words up a little bit." The men had "small talk" then defendant asked Hendricks "How about paying back some of that money?" Defendant said Hendricks had borrowed $2,000 from him. Hendricks refused to pay, saying he did not have any money. Defendant said "I don't even care if it's $20 a month," but defendant refused to make any payment. Defendant was "irritated" and went outside, where he paced around. Defendant testified that Gregory told him "Don't do anything stupid," and defendant replied "Don't worry about it. I'm not going to do anything stupid."

Defendant returned to the house. His version of what then transpired is as follows. He again asked Hendricks for payment on the loan. Hendricks refused in a rude manner. Defendant told Hendricks: "I don't know who raised you and I don't know if your father was man enough to raise you, but where I come from I pay off my debt." Hendricks threw down the controller to the video game he had been playing and "started flipping

4

out and acting crazy." Hendricks yelled "Get the fuck out" and "I'm going to beat your ass." Defendant "back-pedal[ed]" to the front door and said "I'm leaving. I just want you to start paying some of that money back." Hendricks said "Fuck you" and charged toward defendant with his "hand cocked to hit" defendant in the face. Defendant testified he hit Hendricks to prevent being hit. The men then punched each other and defendant fell on top of Hendricks. Defendant saw Hendricks's eye was "lacerated" and "in bad shape." In shock, defendant left the house.

On direct examination, defendant was also asked "Did you ever hit Betty [Zierke]?" and he replied "No, I did not." Outside the presence of the jury, the prosecutor told the court "I can prove he hit Betty Zierke and I'd like to do so. I have [Zierke's] prior sworn testimony or I can get Betty Zierke here tomorrow morning." Defense counsel objected, saying "The court has made several rulings that it's not coming in for the truth of the matter."

The court acknowledged its prior rulings limiting evidence of assaults upon Zierke to "the victim's state of mind" but said defense counsel "opened the door" to proof of the assaults to impeach defendant's credibility because he testified he never hit Zierke. Defense counsel argued that evidence defendant hit Zierke had "come in a million times and I thought the ruling was that [Hendricks] could say what he wanted to say about it, but that it wasn't coming in for the truth. [¶] So they've heard it a thousand times and for [defendant] not to be able to just give his statement on that doesn't make any sense." The court disagreed, finding that defense counsel "created a contested issue" "instead of just leaving well enough alone." Defense counsel said "I messed up. I didn't understand Your Honor's ruling." Counsel said she asked defendant about the Zierke assaults only because she believed the court's in limine ruling permitted the prosecutor to examine defendant on the issue.

Defense counsel argued that introducing details of the assaults through cross-examination of defendant or Zierke's testimony would be more prejudicial than probative and offered to stipulate that defendant was twice arrested for domestic violence, that Zierke told the police defendant hit her, and that Hendricks was aware of these facts. The

5

prosecution refused the stipulation and the court ruled the prosecution was entitled to a full cross-examination of defendant on the subject.[1]

The prosecutor's cross-examination of defendant was extensive and included lengthy references to the details underlying defendant's two arrests for domestic violence. Defendant admitted the arrests but denied hitting Zierke, admitting only verbal arguments. The testimony continued: "Q. July 4th, 2012, after the fireworks show, isn't it true that you slapped Betty [Zierke] in the face? [¶] A. No, it is not. [¶] Q. When the police came to where you were and asked if you had slapped Betty Zierke, isn't it true that the first thing you said to them was, 'Well, that's personal'? [¶] A. I never said that. [¶] . . . [¶] On July 4th, what happened was I had a verbal argument with Betty Zierke. The police told me I had to let them in. I let them in, I turned my back and they pulled out their batons and started beating me with them. That is a true story. [¶] So they were going to uncuff me. And I said, 'If you uncuff me, I'm going to beat your ass.' I told the cop that because I was pissed off because they batoned me. [¶] . . . [¶] Q. You tell the police, 'If you unhandcuff me, I'm going to beat your ass,' you say that to the police? [¶] A. After they beat me with batons for having a verbal argument, yes, I would. I'm sure anybody else in here would, too. Would you? [¶] [The Prosecutor] No. [¶] . . . [¶] I would never tell an officer I was going to beat his ass."

Over defense objections, seven pages of police photographs depicting Zierke's injuries were admitted in evidence. The cross-examination continued: "Q. How does she look in those photographs? [¶] A. She looks like Betty. [¶] Q. How does her body look? [¶] A. She looks like she's drinking too much, blackout drunk like she has about 20 times before, probably hit every damn stair and every table around; and I believe she's admitted that in court. [¶] Q. So you look at those photos of Betty Zierke and say, 'She looks like a blackout drunk.' [¶] A. Exactly. That's exactly what I'm saying. You're saying I'm

_____

[1] The prosecution was also granted permission to present Zierke as a witness but she could not be located. The court refused the prosecution's request to introduce Zierke's preliminary hearing testimony.

6

supposed to see a battered woman, and it is not there. It is just ridiculous. [¶] Q. Does Betty Zierke have injuries in those pictures. [¶] A. Not that I see, no. She's got a couple bruises on her leg, whatever, hand, whatever. I can pull my pants up and you could probably see a few bruises, too." Questioning continued. "Q. Do you have any concerns about what you see on those photographs about Betty? [¶] A. I do. [¶] Q. What concerns you about those photographs? [¶] A. It looks like . . . Betty's doing too much drugs, that's what it looks like to me. [¶] Q. That's all. [¶] A. Yeah, that is all I see. . . . [¶] Q. And you know, Mr. Torres, that Betty, who's pictured here, was pregnant with your son, right? [¶] A. No, I did not know that and I still do not know that to this day. [¶] Q. You don't know what? [¶] A. If this child is mine . . . ."

The only other witness for the defense was a psychiatric expert, who testified that Hendricks tested positive for recent methamphetamine use when admitted to the hospital following his fight with defendant. The psychiatrist also testified that methamphetamine use is correlated with aggression and hostility, and chronic use impairs short-term memory and other cognitive functions.

*Rebuttal*

Hendricks's girlfriend testified, over defense objection, that defendant was not welcome at the home she shared with Hendricks because defendant had an "abusive relationship" with her daughter. She said she saw defendant come to the house on the day of the fight but did not open the door to him.

*Closing argument to the jury*

In closing argument to the jury, the prosecutor said defendant admitted punching Hendricks so the only issue was defendant's claim of self-defense. The prosecutor told the jurors: "Your job is to figure out was Rick Hendricks telling the truth or was the defendant telling the truth." The prosecutor said defendant was "a liar" and referred the jurors to the cross-examination of defendant in which defendant called "people all kinds of horrible names, tweakers and blacked out alcoholics and retarded. . . . I mean that's who he is. I'd ask him an unrelated question and he started talking about how he told

officers if they [un]handcuffed him he was going to fucking beat their ass. That's who he is. And that's who they're asking you to rely on when you make your decision." The prosecutor held up a police photograph of Zierke taken when defendant was arrested, pointing to "injuries on her arms, bruises on her legs." The prosecutor said: "This is his ex-girlfriend. And I asked him how do you feel about these pictures? And his answer was, 'She looks blacked out drunk to me.' He didn't care. That's who he is."

**Discussion**

Defendant raises several issues on appeal. The dispositive issue is defendant's claim the court erred in admitting the hearsay evidence of uncharged assaults upon his girlfriend because the evidence was irrelevant (Evid. Code, §§ 210, 350), inadmissible character evidence (Evid. Code, § 1101, subd. (a)), and unduly prejudicial (Evid. Code, § 352).

1. *General principles*

The standard governing admission of the challenged evidence is well-established. "Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is broadly defined as that having a 'tendency in reason to prove or disprove any disputed fact that is of consequence' to resolving the case. (Evid. Code, § 210.) Inferences drawn from the evidence must be logical and reasonable, not merely speculative. [Citations.] All relevant evidence is admissible, unless a specific statutory or constitutional provision bars its admission. (Evid. Code, § 351; Cal. Const., art. I, § 24.) If evidence is relevant and admissible for one purpose, but inadmissible if considered for another purpose, the trial court must admit it but, upon request, limit its proper scope and so instruct the jury. (Evid. Code, § 355.)" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.)

" 'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant

8

to establish some fact other than the person's character or disposition.' [Citation.] 'Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.] The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect. [Citation.] When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." [Citation.]' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667.) A trial court's rulings on relevance and admission of evidence under Evidence Code section 352 are reviewed for abuse of discretion. (*Fuiava*, at pp. 667-668.)

2. *The trial court abused its discretion in admitting evidence of uncharged crimes.*

In pretrial proceedings, the prosecutor said he wanted to introduce Hendricks's testimony that "defendant was unwelcome in his house because [defendant] beat up Betty Zierke." Defendant objected and filed an in limine motion to exclude "evidence of any alleged prior criminal acts or uncharged misconduct" as irrelevant, hearsay, improper character evidence, and unduly prejudicial. The trial court found the testimony relevant and admissible to prove Hendricks's state of mind: "Why the person was in fear of him is fair game. I mean, if Justin Bieber is coming to my house to beat me up, I don't have to worry about it. If Mike Tyson is coming to my house to beat me up, I'd be scared out of my shoes. And that's fair game. Why were you afraid of the person coming into the house? Because what you know about that person is fair game, other than you can't cross any lines and you can't get anything that's inappropriate like I knew he had X number of convictions or things like that, but that he's got a reputation for pummeling people, that's fair game." Defense counsel observed that "Hendricks is not going to be testifying that he

acted in self-defense, [so] I don't know why [defendant's] reputation is at play here." The court replied, "I think it absolutely is relevant."

The court erred. Hendricks's state of mind was not an issue in the case. There was no evidence Hendricks feared defendant. When asked to describe his relationship with defendant, Hendricks testified their relationship was "sort of sketchy" and that they "weren't getting along." He said he asked defendant "not to show up to my house" because there were "issues with him and my girlfriend's daughter," not because Hendricks feared defendant. When defendant came to the house to demand repayment of a loan, Hendricks ignored defendant and continued sitting on the couch playing a videogame in an apparently relaxed manner. He did not testify that he feared defendant nor did his version of the fight rest on any supposed fear of Hendricks. He testified simply that defendant struck him when he ordered him to leave the house.

The trial court believed, based on prosecutorial representations, that defendant made "an illegal and unlawful entry" and the Attorney General says defendant "barged in to demand money" and suggests that Hendricks feared that the " 'unlawful entry entailed a threat.' (*People v. Hardin* (2000) 85 Cal.App.4th 625, 633-634.)" The record contains no evidence of an illegal entry. The front door was open and only the screen door was closed (and unlocked). Defendant entered the living room in full view of Hendricks, who made no protest. Hendricks testified defendant had been to the house "several times before" and "often let himself in." Any claim of illegal entry is refuted by Hendricks's admission that the two men "had small-talk" when defendant arrived, and defendant was asked to leave only after defendant twice demanded repayment of a loan.

Any fear Hendricks may have had was irrelevant as it had no "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The prosecutor never claimed that Hendricks feared defendant and thus made a preemptive strike against him. The prosecutor's theory of the case—consistent with Hendricks's testimony—was that defendant, without prior physical provocation, punched Hendricks in the face when Hendricks told defendant to leave the house.

10

The Attorney General argues that defendant's assault of Zierke, if not admissible to show Hendricks's fear of defendant, "was admissible to establish that [defendant] was not welcome at the victim's residence, and that when defendant barged in to demand money, Hendricks had cause to eject him." That defendant was unwelcome was irrelevant or, at most, only marginally relevant to the critical question of who started the fight between defendant and Hendricks. Moreover, defendant's lack of welcome was established by Hendricks's testimony that he asked defendant to stay away because defendant had "issues" with Zierke. There was no need for Hendricks's further testimony that defendant "assaulted" Zierke.

Moreover, any relevance of the evidence was outweighed by its prejudicial effect. (Evid. Code, § 352.) Evidence of uncharged offenses " 'is so prejudicial that its admission requires extremely careful analysis.' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) Not only was the challenged evidence hearsay, but its probative value was slight and the likelihood of the jury confusing the issues and accepting evidence of the assaults as proof of defendant's violent propensity was great. The jury was highly likely to view defendant's "reputation for pummeling people," as the trial court termed it, as proof that defendant acted in conformity with that reputation and pummeled Hendricks.

Still further, evidence of the assaults was admitted without a limiting instruction. Although defense counsel asked the court following Hendricks's testimony to instruct the jury that statements about defendant assaulting Zierke were not admitted for the truth of the matter asserted, the court denied the request: "There's no reason why they would use it for its hearsay purpose, for the truth of what it asserts. Because the truth of the matter of what it asserts is not an issue." Defense counsel disagreed "that jurors understand that it's not coming in for the truth" but the court said "I don't think [the jury] needs to be told it's not for the truth."

The court unquestionably should have given the instruction. "When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court

11

upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355.) The Attorney General asserts that defendant forfeited his right to an instruction when defense counsel failed to renew her request at the close of evidence. We find no basis for declaring a forfeiture. Defense counsel requested a limiting instruction when Hendricks testified and the court was adamant in its refusal. While initially indicating an unwillingness to "interrupt" the trial with an instruction during a witness's testimony , the court immediately clarified its position that the jurors would understood the limited use of the evidence and required no instruction on the matter. Defense counsel did not forfeit the issue by accepting the court's ruling. " ' "An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he [or she] was not responsible." ' [Citations.]" (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212-213.)

Even if defendant could be said to have forfeited his request for a limiting instruction, the trial court has a sua sponte duty to provide the instruction in the " ' "occasional extraordinary case" ' in which the evidence at issue ' "is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." ' [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 479-480.) Those conditions are present here. The evidence of defendant's assaults upon Zierke was a dominant part of the prosecution's case, highly prejudicial and minimally relevant.

Whether or not the court's erroneous ruling was responsible for defense counsel's misunderstanding of its scope, counsel did elicit from defendant his denial of assaulting his girlfriend. Absent the fact that Hendricks should not have been permitted to testify that defendant assaulted Zierke in the first place, the trial court was correct that defendant's denial opened the door to impeachment of that denial. (Evid. Code, § 780, subd. (i).) The prosecutor may have been entitled to impeach defendant's claim that he never hit Zierke, but evidence of the assaults was relevant only to demonstrate defendant

12

testified untruthfully and could not be used to prove a propensity for violence. (Evid. Code, § 787.) However, the prosecutor's cross-examination of defendant went well beyond impeaching defendant's credibility. The prosecutor related defendant's police statements, confronted him with photographs of Zierke's injuries, and introduced the fact that Zierke was pregnant when defendant assaulted her. In closing argument to the jury, the prosecutor invited the jury to find that defendant was not only "a liar" but also a bad man. The prosecutor recalled defendant's testimony that he told the arresting officers "if they [un]handcuffed him he was going to fucking beat their ass. That's who he is. And that's who they're asking you to rely on when you make your decision." The prosecutor held up a police photograph of Zierke taken when defendant was arrested, pointing to "injuries on her arms, bruises on her legs." The prosecutor said: "This is his ex-girlfriend. And I asked him how do you feel about these pictures? And his answer was, 'She looks blacked out drunk to me.' He didn't care. That's who he is." The court's rulings led to cross-examination of defendant and closing argument to the jury that misdirected the trial from an inquiry into defendant's conduct into an analysis of his character.

We conclude that the cumulative effect of the errors—the admission of Hendricks's testimony about the Zierke assaults, the failure to give a limiting instruction, and permitting cross-examination of defendant that went far beyond impeachment—requires reversal. The trial was essentially a credibility contest between defendant and Hendricks, each of whom testified the other was the aggressor. The testimony of Hendrick's girlfriend and of his roommate provided only slight corroboration of Hendrick's version of events. Evidence that defendant assaulted his pregnant girlfriend and photographs of her injuries was likely used by the jury to conclude that defendant was a violent man and acted in conformity with his violent nature by attacking Hendricks. This likelihood is reinforced by the prosecutor's argument to the jury that focused on defendant's bad character and the court's failure to instruct the jury not to use the evidence to infer a propensity for violence. It is reasonably probable a result more favorable to defendant would have been reached in the absence of the errors. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

## Disposition

The judgment is reversed and the case remanded for retrial or other proceedings consistent with this opinion.

_____
Pollak, Acting P. J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.

15