Filed 5/16/24  P. v. Womack CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DARREN JOSEPH LEE WOMACK, JR.,<br><br>    Defendant and Appellant. | F084424<br><br>(Super. Ct. No. CR-20-011719)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ricardo Cordova, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

On March 24, 2022, a jury convicted defendant Darren Joseph Lee Womack, Jr., of first degree murder (Pen. Code, §§ 187, subd. (a), 189; count I) and first degree

burglary (§§ 459, 460, subd. (a); count II).  (Undesignated statutory references are to the Penal Code.)  Enhancement allegations, which will be discussed later, were also found true.  Subsequently, as to count I, defendant was sentenced to a total indeterminate term of 75 years to life, and as to count II, he was sentenced to a total determinate term of 12 years, to run concurrent with count I.

On appeal, defendant contends:  (1) his first degree murder conviction must be dismissed because there lacks substantial evidence "he [was] the individual who shot and killed the victim" and alternatively, "the prosecution failed to prove that he was not acting in lawful self-defense"; (2) he was deprived of his constitutional rights to a jury trial and due process when the trial court improperly instructed the jury with CALCRIM No. 521, which "provided an inaccurate definition of premeditation," and CALCRIM No. 571, which, based on the evidence, inaccurately informed the jury that "'[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force'" (italics omitted); (3) he was denied his constitutional right to effective assistance of counsel when his trial counsel failed to "request the court to instruct the jury that provocation can reduce first degree murder to second degree murder, and that a subjective test for provocation applies to murder, which is different than the objective test for provocation that applies to voluntary manslaughter" and failed to object to several instances of prosecutorial misconduct when the prosecutor, during her closing and rebuttal arguments, improperly commented on the law of provocation, CALCRIM No. 3472, and imperfect self-defense; (4) these several instances of error constituted cumulative prejudice; and (5) "the trial court imposed an unauthorized sentence by failing to stay the sentence on either count [I] or [II] pursuant to section 654 because based on the verdicts and the prosecutor's theory of the case, it is evident the jury found the murder was the intended offense underlying the burglary, and thus both offenses were committed pursuant to a single intent and objective."

2.

Although we conclude the prosecutor misstated the law as to imperfect self-defense, we conclude defendant was not prejudiced by his trial counsel's failure to object to this misstatement of law. As to defendant's remaining claims, we conclude they lack merit. Accordingly, we affirm the judgment.

## PROCEDURAL HISTORY

On March 22, 2022, the Stanislaus County District Attorney filed a first amended information charging defendant with premeditated first degree murder (§§ 187, subd. (a), 189; count I), with the enhancement he personally and intentionally discharged a firearm and proximately caused great bodily injury or death to Lisandro Mendez (§ 12022.53, subd. (d)); and first degree burglary (§§ 459, 460, subd. (a); count II), along with a nonparticipant present allegation (§ 667.5, subd. (c)(21)), and firearm use enhancement (§ 12022.5, subd. (a)). The first amended information also alleged defendant suffered a prior strike offense (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d), 211) and a prior serious felony offense (§ 667, subd. (a)).

On March 24, 2022, a jury found defendant guilty on both counts and found true all enhancements and allegations. Subsequently, as to count I, the trial court sentenced defendant to an indeterminate term of 25 years to life, doubled to 50 years to life because of the prior strike, plus an additional indeterminate term of 25 years to life for the gun enhancement (§ 12022.53, subd. (d)), for a total indeterminate term of 75 years to life. As to count II, the trial court sentenced defendant to the middle term of four years, doubled to eight years because of the prior strike, plus an additional four-year term for the gun enhancement (§ 12022.5, subd. (a)), doubled to eight years for the prior strike, for a total determinate term of 16 years to run concurrent with count I.

Subsequently, on July 11, 2022, the trial court conducted a resentencing hearing based on an error it realized after the fact. As to count II, the trial court resentenced defendant to the middle term of four years, doubled to eight years because of the prior strike, plus an additional four-year term for the gun enhancement (§ 12022.5, subd. (a)),

3.

but chose not to double this term, for a total determinate term of 12 years to run concurrent with count I.

## FACTS

*The Prosecution Case-in-Chief*

### Background

Mendez lived at a residence on Larkin Avenue in Modesto with his mother, his three brothers, and his sister. Mendez slept in the garage, which had been converted into a bedroom. The bedroom was enclosed with four walls and two doors—one interior and one exterior; neither door was secure. The interior door was broken and items were placed on one side of the door to block access to the other side. The exterior door's lock had "broken off" and it did not have a functioning doorknob.

The property had a metal chain-link fence with two gates. One gate was at the end of the walkway leading to the residence; the second gate was at the entry of the driveway and "when you pushed it open, you could hear [it] scrape on the [ground]." Further, there was an alleyway just west of the residence, running north and south from Larkin Avenue to Oregon Drive. Oregon Drive "is the street to the north of Larkin" Avenue and is just south of Oregon Park.

### The Murder

On December 14, 2020, at approximately 10:00 p.m., the two youngest brothers of Mendez were in his bedroom playing video games when Mendez and his friend Thomas S.[1] entered the room. Mendez told both his brothers to go inside the house, and one brother, C.R., responded he would "go in a bit." A couple of seconds later, C.R. heard the second gate scraping on the ground. At this point, Mendez "told [C.R.] just to go like get down." Subsequently, an individual banged on the exterior entry door and

---

[1]Thomas was called to testify as a witness for the prosecution. However, Thomas invoked his Fifth Amendment right against self-incrimination and refused to testify.

tried to get into the bedroom. Mendez attempted to hold the door shut "[w]ith his hands and his … body." He told the intruder "that [his two brothers] were in there, and that [the intruder] wasn't going to be able to get in."

Thereafter, C.R. saw "a [hand]gun in the person's hand, and the gun looked black and had a red laser on it." At this point, C.R. recognized the intruder as defendant, who was wearing a black shirt. Defendant was able to enter the room and he and Mendez then "started … struggling like over the gun, and [Mendez] was trying to take it away …." Subsequently, C.R. heard "one bullet misfire[]," but he was unsure "where it went." C.R. was scared and "started like covering [his] head …." Eventually, he looked over and saw "[Mendez] … on the floor." While Mendez was on the floor, defendant stood "over [Mendez's] body, and then shot him once in the back." C.R. testified the handgun was "[l]ike three or four feet" away from Mendez's back when it was fired. (C.R. testified he heard "[j]ust two" gunshots.)

Defendant "tried to open the door and he tried to run away, but he really couldn't because the way [Mendez's] head was—like body was, it was kind of like blocking it, but he ended up getting away." According to C.R., the whole incident lasted less than a minute. C.R. further testified defendant and Mendez were friends, and he had seen defendant on five prior occasions—the last being "[a] couple months" before the murder. C.R. knew that defendant drove a dark blue "family car."

Mendez's sister heard "gunshots really close by, and [she] ran to [her] brother's room." She then observed defendant "trying to come out of [Mendez's] room." Defendant "ha[d] a gun in his hand, and all [she saw] was the red light [of the laser] on [her] stomach." Defendant then ran to the front gate and "[h]e tripped over the mailbox and dropped the gun, and he got up and r[an] towards the alley." Later, emergency personnel arrived on scene and transported Mendez to the hospital where he was later pronounced dead.

5.

**The Crash**

Subsequently, at or around 10:20 p.m., Modesto Police Department (MPD) Officer Felix Carrillo was enroute to the Larkin Avenue address when he was "notified of a vehicle that collided around the corner from the address." He arrived on scene and noticed a blue Volvo station wagon[2] had crashed into a short fence in front of a residence at Oregon Avenue. Officer Carrillo looked inside the Volvo and noticed "there was blood inside of the vehicle" and the vehicle "was still running." A detective searched the vehicle, collected blood samples,[3] and seized a cell phone located in the center console area.

At approximately 11:00 p.m., a hospital security guard was informed a "gunshot wound patient [was] coming in to the ER." The security guard told officers she then observed "a gold or beige color Suburban pull into the entrance of the emergency drop off" and defendant walk into the hospital for treatment. MPD Officer John Carrico arrived at the hospital, contacted defendant, and noticed his clothing "consisted of a black shirt [¶] … [¶] [and] [b]lack shorts with a white stripe." He then noticed defendant had small scratches on his left shoulder blade and left lower back, along with a "hole in his right hip area, and then one on his left chest about three inches below his left nipple area was another small hole." Defendant also had an injury to the inside part of his left thumb,[4] and his back was covered in dirt. Officer Carrico spoke with defendant, who told him "he had been in some type of vehicle collision or car accident." Officer Carrico

---

[2]Officer Carrillo incorrectly identified the vehicle as "a blue Volkswagen." However, another MPD officer correctly identified the crashed vehicle as "[a] blue Volvo station wagon" (People's exhibit 50).

[3]Both parties stipulated to the following: "The blood samples were then submitted for DNA analysis and subsequently completed by Senior Criminalist Steven Cavanaugh. Steven Cavanaugh determined the DNA associated with the human blood collected from the Volvo driver's door handle belong[ed] to … defendant."

[4]An MPD detective testified this injury "would be consistent … [with] the finger being close to the barrel of the gun at the time the gun is fired …."

testified that during this interview defendant "seemed to be evasive and didn't want to answer [his] question[s]."

**Subsequent Law Enforcement Investigation**

At 11:36 p.m., investigators arrived at the Larkin Avenue address. Investigators entered the converted garage/bedroom and noticed a cell phone on top of the bed. They began searching for bullets and "did not find or locate any expended bullets, [but] did find shell casings." There were "two .40-caliber expended shell casings behind the door [¶] [a]nd then when [they] were examining the clothing that had been cut off from [Mendez] …, [they] located an expended nine-millimeter [shell casing]." Further, a live .40-caliber round was found underneath the vehicle on the driveway, as well as "blood droplets and … additional clothing from [Mendez]." In the street there "were three expended .40-caliber shell casings." Investigators also located an empty Glock pistol case inside the bottom drawer of a nightstand located next to Mendez's bed.

Officers obtained surveillance footage from the night of the murder. The surveillance footage showed "a [Volvo] crash through the fence into a parked vehicle at [the] Oregon" address. Subsequently, "a human subject gets out of the driver's side of the car, appears to shut the door behind or shut the door as the person is leaving the vehicle." The individual then ran in the direction towards Oregon Park.

MPD Detective Philip Weber, an expert in cell phone data extraction, analyzed an Alcatel cell phone belonging to defendant and an iPhone XR that belonged to Mendez. On December 14, 2020, at 9:10 p.m., there was a call from defendant's phone to Mendez's phone that lasted one minute and 52 seconds. Subsequently, at 9:13 p.m., another call was made from defendant's phone to Mendez's phone that lasted eight minutes and 52 seconds. Defendant and Mendez also exchanged messages via Facebook Messenger chat. On December 6, 2020, defendant sent Mendez a Facebook Messenger

chat stating, "'[S]hoot your number'"[;] Mendez then responded with his cell phone number.

Detective Weber also reviewed defendant's cell phone web history. On December 7, 2020, at 5:22 p.m., defendant searched the web for "'ghost gun laws in CA.'" At 5:23 p.m., defendant searched, "'Ghost Guns in California[,]'" and at 5:24 p.m., he searched, "'Are guns legal in California.'" At 5:25 p.m., defendant again viewed the article titled, "'Ghost Guns in California'" and subsequently refreshed or reopened this article.

On cross-examination, Detective Weber acknowledged the presence of Snapchat[5] conversations on Mendez's phone indicating he was upset with his friends over a gun. Specifically, Mendez was "upset with some of his friends related to a gun that he gave his friend … that was taken from [his friend] because of a debt that [Mendez] owed [to another individual] because of a gun that was lost before." There were additional conversations where Mendez indicated he wanted a gun. There were also several photographs of Mendez holding "various different guns" and some of these photographs were taken within 10 days of the murder.

**Autopsy and Ballistics Evidence**

Forensic pathologist Dr. Sung-Ook Baik performed an autopsy on Mendez. Dr. Baik discovered "a bullet wound located on the back of the right shoulder." "The bullet penetrate[d] the right third rib, and the right lung, and aorta, esophagus, left lung, and the stomach." Dr. Baik located the bullet inside Mendez's stomach and determined Mendez "died of blood loss due to [a] gunshot wound to the back."

---

[5]"Snapchat is a phone application that, among other things, allows users to post 'stories.'" (*In re A.G.* (2020) 58 Cal.App.5th 647, 650.) "A story is a photograph or video posted by a Snapchat user. The user can add captions and other effects to the photographs and videos." (*Id*. at pp. 650–651.)

Firearms expert Anthony Sutter testified he received four fragments of the bullet removed from Mendez's body and analyzed these fragments to determine the bullet's caliber.  He determined the bullet was "likely a nine-millimeter Luger" and further testified "it is possible to fire a nine millimeter Luger in a 40 Smith & Wesson firearm," but clarified "it's extremely unlikely" in this case based on the bullet's markings.

*The Defense*

Forensic criminologist Brent Turvey, Ph.D., testified for the defense.  Dr. Turvey examined the evidence in this case and concluded there were five separate events:  (1) an attack in the garage doorway, (2) defendant was shot, (3) Mendez was shot, (4) a shooter or shooters firing guns in or near the street, and (5) defendant crashing the vehicle.  Specifically, he opined to the following:

> "We don't have—we know there's at least a .40 caliber firearm involved in this case and at least a nine-millimeter involved in this case. Two separate weapons.  It is unreasonable to think [defendant] entered like wild Bill doing two different guns with two sets of ammunition, if you assume he's the shooter.  But that would be an assumption.  There's no physical evidence to show any one of the two people shot in this case were actually the shooter.  We don't have that physical evidence that puts a gun in any one person's hands.  Again, somebody collected those firearms from the scene and got rid of them, because they were not found at the scene and were not collected by the police.

> "See we have at least two guns, neither of the victims—neither the defendant or the homicide victim are associated with those guns that I'm aware of by physical evidence, and we have evidence of at least one-third [*sic*] party shooting at the scene and cleaning and removing the firearms.

> "Given the absence of other investigative forensic efforts, we're left with a lot of unanswered questions.  It's very possibly a third person could have come in there and shot both of them, or two people came in and shot both of them.  That possibility has not been eliminated.  There's been no investigation that shows any forensic effort to lockdown and connect the victim with the guns or the defendant with the guns.  All we know is there's no gun in his car.  There's no firearm that he takes with him when he leaves[.]  [¶] … [¶] … There's so much unknown here, and the physical

9.

evidence does not appear to have been attended to.  We can't use the physical evidence to answer any of the significant questions in this case."

## DISCUSSION

### I. Substantial Evidence Supports Defendant's First Degree Murder Conviction

Defendant contends his first degree murder conviction must be dismissed because there lacks substantial evidence "he [was] the individual who shot and killed the victim," and alternatively, "the prosecution failed to prove that he was not acting in lawful self-defense."  As to both claims, we disagree.

#### A. Applicable Law

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).)  "[M]alice may be express or implied."  (§ 188, subd. (a).)  "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature."  (§ 188, subd. (a)(1).)  "'Intent to unlawfully kill and express malice are, in essence, "one and the same."  [Citation.]'"  (*People v. Perez* (2010) 50 Cal.4th 222, 233, fn. 7.)  "'A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.'  [Citation.]  'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'"  (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

The principles governing a challenge to the sufficiency of the evidence underlying a first degree murder conviction are well settled.  Under the substantial evidence standard of review, we examine the entire record in the light most favorable to the judgment below (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028), "examin[ing] the record independently for '"substantial evidence—that is, evidence which is reasonable, credible, and of solid value"' that would support a finding beyond a reasonable doubt."  (*People v. Banks* (2015) 61 Cal.4th 788, 804.)  Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient

substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### B. Analysis

#### 1. *Defendant Was the Shooter*

Here, substantial evidence exists to support the jury's finding defendant was the actual shooter. C.R. testified defendant and Mendez were friends, and C.R. had observed defendant on five prior occasions. Further, C.R. identified defendant in court as the individual who broke into Mendez's bedroom and shot Mendez. Specifically, he testified that on the night of the murder, defendant wore a black shirt and had "a [hand]gun in [his] hand, and the gun looked black and had a red laser on it." C.R. then testified he observed Mendez on the floor, and at that point defendant stood three or four feet away from Mendez's "body, and then shot him once in the back." C.R.'s testimony by itself provided substantial evidence to support the jury's finding that defendant shot Mendez. (*People v. Jones* (2013) 57 Cal.4th 899, 963; see *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].)

Further, additional evidence exists to corroborate C.R.'s testimony. Mendez's sister testified she heard "gunshots really close by, and [she] ran to [her] brother's room" and observed defendant "trying to come out of [the] room." She then observed defendant with "a gun in his hand, and all [she] s[aw] was the red light [of the laser] on [her] stomach." Defendant then ran away from the house, "tripped over the mailbox and dropped the gun, and he got up and r[an] towards the alley." The sister's testimony provided corroborating evidence to support C.R.'s recollection of events.

Nonetheless, defendant argues "[t]he evidence … fails to establish that [he] was the person who shot [Mendez]" because "[t]hirteen-year-old C.R. was the only eyewitness to testify about the shooting, but a critical portion of his testimony conflicted

11.

with the physical evidence and much of his testimony was uncorroborated." Specifically, defendant points out certain inconsistencies in the evidence in support of his argument that insufficient evidence exists to support the verdict. First, he points to the fact that two .40-caliber shell casings were found inside the bedroom, even though a nine-millimeter shell casing was recovered from Mendez's pants and a nine-millimeter bullet was found inside Mendez's stomach. Second, defendant points to inconsistencies and potential bias in the testimony of Mendez's sister, along with the fact that Thomas S. refused to answer any questions about the incident and thus, "it is reasonable to infer he was more than a mere bystander." Irrespective of these inconsistencies, "[w]e do not redetermine the weight of the evidence or the credibility of witnesses" (*In re M.S.* (2019) 32 Cal.App.5th 1177, 1185), and "'[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.'" (*Ibid.*, quoting *People v. Young*, *supra*, 34 Cal.4th at p. 1181.) Overall, "[i]f the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) Because C.R. testified he observed defendant shoot Mendez in the back, coupled with the sister's testimony she observed defendant with a firearm, this constitutes substantial evidence to support the jury's conclusion defendant was the actual shooter.

### 2. Defendant's Self-defense Claim

Alternatively, defendant argues, "[e]ven assuming, arguendo, that sufficient evidence established [he] was the shooter, [his] murder conviction is not supported by substantial evidence because the prosecution failed to prove that [he] did not act in lawful self-defense." "'To justify an act of self-defense …, the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him. [Citation.]' [Citation.] The threat of bodily injury must be imminent [citation], and '… any right of

12.

self-defense is limited to the use of such force as is reasonable under the circumstances.'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065, italics omitted.) The defendant's belief in the need to act in self-defense must be objectively reasonable as determined from the point of view of a reasonable person in the defendant's position. (*Id*. at p. 1065; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083.) "It is well established that the ordinary self-defense doctrine—applicable when a defendant reasonably believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1, italics omitted; accord, *People v. Valencia* (2008) 43 Cal.4th 268, 288.) If the evidence raises the possibility the defendant acted in self-defense or with another justification, the burden is on the prosecution to prove beyond a reasonable doubt the defendant did not act in self-defense or with another legal justification. (*People v. Rios* (2000) 23 Cal.4th 450, 462.)

As it relates to the self-defense doctrine, we find both *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, disapproved on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214, and *People v. Hardin* (2000) 85 Cal.App.4th 625 (*Hardin*) instructive. In *Szadziewicz*, the defendant broke into a sleeping victim's hotel room armed with a knife in an attempt to steal drugs. (*Szadziewicz*, *supra*, at pp. 829–831.) During his trial for attempted murder, the defendant testified he knifed the victim in self-defense when the victim awoke, jumped out of bed, and pushed the defendant up against a wall. (*Id*. at pp. 832–833.) The court rejected the defendant's assertion the trial court erred in not instructing the jury with the imperfect self-defense instruction because the defendant "created the circumstances under which his adversary's attack or pursuit [was] legally justified [and thus, he could] not invoke unreasonable self-defense." (*Id*. at p. 834.)

Further, in *Hardin*, "[t]he primary issue presented [was] whether a number of instructions concerning a resident's right of self-defense impinged on [the] defendant's

assertion of imperfect self-defense against a charge of murder." (*Hardin*, *supra*, 85 Cal.App.4th at p. 628.)  Specifically, the defendant argued that "his entry into [the victim's] home was no more than 'a mere trespass upon [her] property, even though forcible,'" and he did not "'initiate a physical assault upon her or commit some other form of felony.'" (*Id.* at p. 632.)  Thus, "'the victim ha[d] no right to use deadly or other excessive force'" and therefore, "he did not, solely by reason of his nonfelonious entry, forfeit his right to self-defense because the victim was not entitled to respond to his mere trespass with deadly force." (*Ibid.*)  However, the court disagreed and stated the following:

> "When [the] defendant burst into her house, [the victim] would be presumptively justified in fearing that the unlawful entry entailed a threat to her life and safety.  She was thus entitled to use force to evict him, force which section 198.5[6] would make presumptively reasonable.…  [The] [d]efendant made no effort to retreat, despite the opportunity to do so offered by [the victim] twice ordering him to leave.  At that point, [the victim] would have been justified in using force (although all she actually did was threaten that use).  Because [the victim] had justification, [the] defendant was not … 'defend[ing] himself against a criminal attempt to take his life.'  The entire situation was created by [the] defendant.  [The victim's] use of force was privileged; [the] defendant's was not." (*Hardin*, *supra*, 85 Cal.App.4th at p. 634, fn. omitted, italics omitted.)

Here, C.R. testified defendant forced himself into Mendez's bedroom at night while holding a black handgun with a red laser.  Similar to the victim in *Hardin*, C.R. testified that Mendez attempted to block the door and told defendant his young brothers were inside the room "and that he wasn't going to be able to get in."  Mendez gave

---

[6]Section 198.5 states the following:  "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred."

14.

defendant the opportunity to leave, but "[d]efendant made no effort to retreat." (*Hardin*, *supra*, 85 Cal.App.4th at p. 634.) Even assuming Mendez shot defendant first, because "[t]he entire situation was created by defendant[,] [Mendez's] use of force was privileged; defendant's was not." (*Ibid*.) Therefore, substantial evidence exists that defendant was not acting in lawful self-defense when he shot Mendez. Accordingly, substantial evidence supports defendant's first degree murder conviction.

## II.     Instructional Error Claims

Further, defendant makes two instructional error claims. First, he contends "the [CALCRIM No. 521] instruction provided an inaccurate definition of premeditation which removed the element from the jury's consideration, in violation of [his] state and federal constitutional rights to a jury trial and due process." Specifically, defendant takes issue with the portion of the CALCRIM No. 521 instruction stating, "The defendant acted with premeditation if he decided to kill before completing the acts that caused death." (Italics omitted.) Second, he contends "[t]he version of CALCRIM No. 571 given to the jury … included the following optional sentence, 'Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force[,]' [which,] [b]ased on the evidence, … resulted in denying [him] his state and federal constitutional rights to a trial by jury and due process of law." (Italics omitted.) As to both claims, we disagree.

As both parties agree, trial counsel did not object either to CALCRIM No. 521 or CALCRIM No. 571, nor did trial counsel request any modifications to these instructions. In general, "'[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language'" in the trial court. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 617.) "But no forfeiture will be found where … the court's instruction was an incorrect statement of the law [citation], or the instructional error

15.

affected the defendant's substantial rights." (*People v. Mason* (2013) 218 Cal.App.4th 818, 823.)

As to the alleged instructional error regarding CALCRIM No. 521, defendant argues the trial court's instructions "effectively removed the element of premeditation from the jury's consideration, thereby affecting [his] substantial constitutional rights to a trial by jury and due process of law." Further, as to the alleged instructional error regarding CALCRIM No. 571, defendant argues "[s]ince the instructional error affected [his] substantial rights, his claim of instructional error has not been forfeited." Because defendant's position is the challenged instructions, as given, affected his substantial rights, we review these claims on their merits.

## A.    Standard of Review

As noted, defendant did not object to the instructions at trial. Nevertheless, we review the merits of his claims of error regarding the CALCRIM No. 521 and CALCRIM No. 571 instructions to determine whether these instructions affected his substantial rights. (See § 1259 [appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"].) "'"[A] defendant need not assert an objection to preserve a contention of instructional error when the error affects the defendant's 'substantial rights.' [Citation.] In this regard, '[t]he cases equate "substantial rights" with reversible error' under the test stated in *People v. Watson* (1956) 46 Cal.2d 818. [Citation.]" [Citations.] "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim …."'" (*People v. Jimenez* (2016) 246 Cal.App.4th 726, 730, quoting *People v. Lawrence* (2009) 177 Cal.App.4th 547, 553–554, fn. 11.)

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively

16.

direct a finding adverse to a defendant by removing an issue from the jury's consideration [citations]." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.'" (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

## B.    Additional Factual Background

As to CALCRIM No. 521, the trial court instructed the jury as follows:

> "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the acts that caused death.

> "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

> "The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*.

> "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

Further, as to CALCRIM No. 571, the trial court instructed the jury as follows:

17.

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.

"If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense if:

"The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;

"AND

"The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

"BUT

"At least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"A danger is imminent if, when the fatal wound occurred, the danger actually existed or the defendant believed it existed. The danger must seem immediate and present, so that it must be instantly dealt with. It may not be merely prospective or in the near future.

"Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People

18.

have not met this burden, you must find the defendant not guilty of murder."

### C.    Analysis

#### 1.    *CALCRIM No. 521*

Here, CALCRIM No. 521 adequately apprised the jury of the relevant legal principles.  Our Supreme Court explained, "'In the context of first degree murder, "'premeditated' means 'considered beforehand.'"'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.)  Defendant argues the language of CALCRIM No. 521, which stated, "The defendant acted with premeditation if he decided to kill before completing the acts that caused death," eliminated the critical distinction between premeditation and intent to kill.  We do not find this sentence to be an incorrect statement of the law.  In the context of the instruction, we see no meaningful distinction between "'"'considered beforehand'"'" (*Houston*, at p. 1216) and "decided to kill before …."  (CALCRIM No. 521).

Our Supreme Court has held that CALJIC No. 8.20, the predecessor to CALCRIM No. 521, is a correct statement of law.  (*People v. Lucero* (1988) 44 Cal.3d 1006, 1021.)  CALJIC No. 8.20 provides that "[t]he word 'premeditated' relates to when a person thinks and means considered beforehand.  One premeditates by deliberating before taking action."  On the other hand, CALCRIM No. 521 provides a "defendant acted with premeditation if (he/she) decided to kill before completing the act[s] that caused death."  (Italics omitted.)  We conclude the phrase "considered beforehand" in CALJIC No. 8.20 and the phrase "decided to kill before completing the act[s]" in CALCRIM No. 521 both convey the correct principle of law concerning premeditation, meaning "considered beforehand."  (See *People v. Houston*, *supra*, 54 Cal.4th at p. 1216.)  Additionally, CALCRIM No. 521 also instructed the jury "[a] decision to kill made rashly, impulsively, or without careful consideration is *not* deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is the extent of the

19.

reflection, not the length of time." (Italics added.) Although defendant argues "[t]he remainder of the instruction failed to clarify and accurately define this essential element," we instead conclude this additional language further clarified the requirements for both premeditation and deliberation.[7] Accordingly, we conclude that CALCRIM No. 521, as given here, was a correct statement of the law and adequately instructed the jury regarding premeditation. (*Lucero*, *supra*, at p. 1021.)

### 2. CALCRIM No. 571

Further, the trial court properly instructed the jury with the "wrongful conduct" language of CALCRIM No. 571. As discussed above, "It is well established that the ordinary self-defense doctrine—applicable when a defendant reasonably believes that his safety is endangered – may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created the circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1, italics omitted.) "It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if

---

[7]Defendant attempts to analogize this case with our Supreme Court's decision in *People v. Bender* (1945) 27 Cal.2d 164, abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110. In *Bender*, our Supreme Court found instructional error when the trial court instructed the jury that a defendant "'can premeditate, that is, think before doing the act, *the moment he conceives the purpose*, as well as if the act were the result of long preconcert or preparation.'" (*Id*. at p. 182.) The court concluded the jury was not properly instructed regarding first degree murder because "if an act is deliberate and premeditated even though it be executed in the very moment it is conceived, with absolutely 'no appreciable' time for consideration—then it is difficult to see wherein there is any field for classification of second degree murder." (*Ibid*.) Essentially, the trial court "wholly deleted the only difference, in this type of case, between first and second degree murder." (*Id*. at p. 183.) As noted above, unlike in *Bender*, the trial court here defined both "premeditation" and "deliberation" with the model CALCRIM instruction (CALCRIM No. 521), which our Supreme Court has held to be an accurate statement of the law. (*People v. Lucero*, *supra*, 44 Cal.3d at p. 1021.) Therefore, *Bender* is distinguishable from the instructions in this case.

the felon killed his pursuer with an actual belief in the need for self-defense." (*Ibid.*; see, e.g., *People v. Ramirez* (2015) 233 Cal.App.4th 940, 948 ["Simply put, a defendant who assaults his victims with a gun may not set up a valid self-defense claim with evidence he believed the victims also reached for a gun, since they would be justified in meeting deadly force with deadly force"]; *Hardin*, *supra*, 85 Cal.App.4th at p. 634 ["Because [the victim] had justification, [the] defendant was not … 'defend[ing] himself against a criminal attempt to take his life.' [Citation.] The entire situation was created by [the] defendant. [The victim's] use of force was privileged; [the] defendant's was not," italics omitted].)

Defendant argues that "due to the inclusion of the wrongful conduct sentence in CALCRIM No. 571, the jury was not allowed to find that [he] acted in imperfect self-defense if it found that he forced his way into [Mendez]'s room or otherwise created circumstances which justified [Mendez]'s use of nondeadly force." However, as we discussed in part I of the Discussion, *ante*, in analyzing whether substantial evidence supported the jury's finding defendant did not act in lawful self-defense, C.R. testified defendant forced himself into Mendez's room while holding a black handgun with a red laser. Without considering other corroborating evidence, C.R.'s testimony alone provided sufficient evidence to support the "wrongful conduct" instruction. (*In re Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1; *People v. Jones*, *supra*, 57 Cal.4th at p. 963; see *People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386 ["[A] trial judge must only give those instructions which are supported by substantial evidence"].) Again, defendant directs this court to numerous inconsistencies in the record in support of his contention. However, as we stated above, irrespective of these inconsistencies, we do not redetermine the weight of the evidence or issues of witness credibility and resolution of conflict and inconsistencies in the evidence because these determinations are the exclusive province of the trier of fact. (*In re M.S.*, *supra*, 32 Cal.App.5th at p. 1185.) Accordingly, the trial

21.

court properly instructed the jury with the "wrongful conduct" language in the CALCRIM No. 571 instruction.

Defendant further contends these alleged errors were prejudicial under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24. Because we conclude the trial court accurately instructed the jury regarding the elements of first degree murder (CALCRIM No. 521) and voluntary manslaughter (CALCRIM No. 571), we need not undertake a prejudicial error analysis.

## III.    Ineffective Assistance of Counsel Claims

Defendant further contends he was denied his federal and state constitutional right to effective assistance of counsel when his trial counsel failed to: (1) "request the court to instruct the jury that provocation can reduce first degree murder to second degree murder, and that a subjective test for provocation applies to murder, which is different than the objective test for provocation that applies to voluntary manslaughter"; and (2) "object to several instances of prosecutorial misconduct that occurred during the prosecutor's closing and rebuttal arguments." (Some capitalization omitted.) As to each ineffective assistance of counsel claim, we disagree.

### A.    Standard of Review

Defendant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425, disapproved on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To establish such a claim, defendant must show (1) his counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's error, a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

22.

"Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Strickland*, *supra*, 466 U.S. at p. 689.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Reversal is permitted "'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) "In light of the deferential standard, appellate courts do not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight and, for this reason, tactical errors do not generally provide a basis for reversing a conviction." (*People v. Clotfelter* (2021) 65 Cal.App.5th 30, 55, accord, *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

### B. Defendant Did Not Receive Ineffective Assistance of Counsel When His Trial Counsel Did Not Request the Trial Court to Instruct the Jury with CALCRIM No. 522

Specifically, defendant argues he received ineffective assistance of counsel when his trial counsel failed to request CALCRIM No. 522 because the "evidence warranted the instruction on the lesser included offense of voluntary manslaughter based on heat of passion, as well as the instruction on excusable homicide based on an accidental killing in the heat of passion, and thus it also warranted an instruction [CALCRIM No. 522] on the effect of provocation on the degree of murder."

### 1. *Additional Factual Background*

During the jury instruction conference, trial counsel requested jury instructions on both voluntary and involuntary manslaughter.  The prosecutor objected, but the trial court instructed the jury on both voluntary and involuntary manslaughter, as well as first and second degree murder.  Further, as to whether CALCRIM No. 522 (Provocation: Effect on Degree of Murder) should be provided to the jury, the following exchange occurred between the trial court, the prosecutor, and trial counsel:

> "[THE COURT:]  And then my next question is whether the provocation instruction 522 should be given.  There is some mention of provocation in one of the instructions, but 522 specifically deals with provocation right after first degree murder.

> "[PROSECUTOR]:  I think we need to wait until defense's evidence is put on.  I haven't seen any evidence of provocation which is why I didn't include it.

> "[TRIAL COUNSEL]:  I don't have the 522 in the stack.

> "THE COURT:  It's not in there, I was just wondering whether it is needed.  I'll review that again then, but it would depend in part on what happens in defense case."

No further discussions occurred regarding CALCRIM No. 522.  Subsequently, the trial court instructed the jury with CALCRIM No. 511 (Excusable Homicide: Accident in the Heat of Passion), in pertinent part, as follows:

> "The defendant is not guilty of murder if he killed someone by accident while acting in the heat of passion.  Such a killing is excused, and therefore not unlawful, if, at the time of killing:

> "1.  The defendant acted in the heat of passion;

> "2.  The defendant was suddenly drawn into combat by [Mendez];

> "3.  The defendant did not take undue advantage of [Mendez];

> "4.  The defendant did not use a dangerous weapon;

> "5.  The defendant did not kill [Mendez] in a cruel or unusual way;

24.

"6. The defendant did not intend to kill [Mendez] and did not act with conscious disregard of the danger to human life;

"AND

"7. The defendant did not act with criminal negligence.

"A person acts in the heat of passion when he or she is provoked into doing a rash act under the influence of intense emotion that obscures his or her reasoning or judgment. The provocation must be sufficient to have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for the killing to be excused on this basis, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts. [¶] … [¶]

"The People have the burden of proving beyond a reasonable doubt that the killing was not excused. If the People have not met this burden, you must find the defendant not guilty of murder." (Italics omitted.)

Further, the trial court instructed the jury with CALCRIM No. 570 (Voluntary Manslaughter), as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

25.

"1.  The defendant was provoked;

"2.  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"AND

"3.  The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder."

### 2.    *Analysis*

Here, defendant has failed to establish he received ineffective assistance of counsel as trial counsel could have had a sound tactical basis for not asking the trial court

to instruct the jury with CALCRIM No. 522. Specifically, it was reasonable for trial counsel to decline to request an instruction that did not advance the defense's theory of the case. (*People v. Wader* (1993) 5 Cal.4th 610, 643 [holding that defense counsel could have had a rational tactical purpose for not requesting an instruction that was inconsistent with the defense's theory of the case that the defendant did not intend to kill the victim].) Here, trial counsel's primary argument was focused on convincing the jury that "[i]f [defendant] did shoot [Mendez], it was self-defense because he was shot first." Trial counsel wanted the jury to fully acquit defendant of murder based either on perfect self-defense (CALCRIM No. 505) or accidental homicide in the heat of passion (CALCRIM No. 511). Alternatively, he argued the murder should be reduced to voluntary manslaughter based either on heat of passion/provocation (CALCRIM No. 570) *or* imperfect self-defense (CALCRIM No. 571). Additional jury instructions on provocation, as a basis for *second degree murder* as set forth in CALCRIM No. 522, would have been contrary to trial counsel's strategy because this instruction would have instead focused the jury's attention on using the heat of passion/provocation theory to reach a verdict of second degree murder, rather than to reach a verdict of not guilty or, alternatively, guilt based on voluntary manslaughter. It is possible trial counsel *only* wanted the jury to choose between first degree murder and voluntary manslaughter, and did not want the jury to have the option of finding defendant guilty of second degree murder. Therefore, it was reasonable for trial counsel not to request the trial court to instruct the jury with CALCRIM No. 522.

Nonetheless, defendant attempts to analogize this case to the Ninth Circuit Court of Appeals' decision in *Duncan v. Ornoski* (9th Cir. 2008) 528 F.3d 1222. In *Duncan*, the court held the defendant's trial counsel provided deficient performance by failing to obtain a serology expert to test the defendant's blood and present the results at trial. (*Id.* at pp. 1234–1239.) If trial counsel had done so, the jury would have heard evidence there was a third-party's blood at the scene of the crime. (*Id.* at p. 1241.) The court concluded

27.

this evidence would have raised considerable doubt as to whether the defendant killed the victim, and that, as a result, the defendant might have escaped the death penalty. (*Ibid.*) Specifically, the court found that trial counsel was demonstrably ill-informed about the field of serology. (*Id.* at p. 1236.) At the outset of trial counsel's cross-examination of the government's serology expert, trial counsel told the expert, "'You lost me'" (*id.* at p. 1235), and then proceeded to ask the expert about hair evidence, even though serology involves the study of blood. (*Id.* at pp. 1235–1236.) Thus, the court concluded trial counsel "did not have the personal expertise in serology to make strategic decisions about how to handle the blood evidence on his own and he certainly was not qualified to undermine the State's case by simply cross-examining its experts without obtaining expert assistance himself." (*Id.* at p. 1236.) Therefore, in ruling in the defendant's favor, the court observed, "Although it may not be necessary in every instance to consult with or present the testimony of an expert, when the prosecutor's expert witness testifies about pivotal evidence or directly contradicts the defense theory, defense counsel's failure to present expert testimony on that matter may constitute deficient performance." (*Duncan*, at p. 1235.)

Here, although defendant argues trial "counsel's choices, like those in *Duncan*, were not consistent with sound trial strategy," we find trial counsel's decisions to be fully reasonable. Unlike in *Duncan*, trial counsel did not fail to investigate potentially exculpatory evidence. Instead, trial counsel used evidence in this case, such as evidence that defendant was shot during the altercation, along with evidence that two firearms may have been involved, to argue defendant acted in lawful self-defense. Further, as we noted above, trial counsel ran with this argument in an attempt to fully acquit defendant of murder, or at a minimum, convince the jury to find defendant guilty of only manslaughter. On the record on appeal, we will not say there was no strategic or tactical reason for not requesting the trial court to instruct the jury with CALCRIM No. 522.

Because we are unable to hold trial counsel's performance deficient, we need not address defendant's prejudice argument.  (See *Strickland*, *supra*, 466 U.S. at p. 697.)

**C.**   **Defendant Did Not Receive Ineffective Assistance of Counsel When His Trial Counsel Failed to Object to the Prosecutor's Comments During Her Closing and Rebuttal Arguments**

Additionally, defendant argues he received ineffective assistance of counsel due to trial counsel's failure to object when "[t]he prosecutor committed misconduct during her arguments to the jury by misstating the law on numerous occasions and by relying on a jury instruction that was not given which was an inaccurate statement of the law on to [*sic*] the right to self-defense."

### 1.   *Additional Factual Background*

As it relates to provocation, the prosecutor during her closing argument argued the following:

> "Either way there has to be provocation, and you heard the judge say earlier that slight provocation or remote provocation is not adequate for voluntary manslaughter.  The provocation has to happen immediately before.

> "So we can't think about maybe it was something that was said on the phone call, because that's not adequate.  That's remote provocation.  That's too far away.  That was an hour earlier.  And words don't justify the use of deadly force anyway.  So we know that heat of passion definitely does not work."

Additionally, as to an individual's right to self-defense, the prosecutor argued the following during her closing argument:

> "See self-defense is when someone reasonably believes they're in imminent danger of being killed or being hurt severely, essentially GBI, which is great bodily injury.  In fear of being killed or being gravely injured.  And that the immediate response is to use deadly force in order to stop that danger.  So it has to be immediate, and it has to be necessary.  It has to be reasonable, necessary, and immediate.  And that you can't use any more force than necessary.

29.

"We know this is not the case in this situation. One of the biggest factors is that self-defense cannot be contrived, which means you can't provoke it. You have no right to self-defense if you provoke a fight or quarrel with the intent of creating an excuse to use force.

"So you can't just go to somebody's house, break into their bedroom expecting or knowing that they're going to try to defend themself, and then when they do defend themself, use that as a justification for shooting them. That's not self-defense."

Subsequently, during the prosecutor's rebuttal argument, she reiterated the following:

"And, again, with the self-defense argument, it can't be contrived. He can't break into—defense says, well, you have to prove he broke into the house knowing that [Mendez] would shoot him so he could shoot back. That's not what I said. It is reasonable and logical under any circumstance that if you break into somebody else's bedroom while you're carrying a gun, that someone could die. And [defendant] wanted to make sure it wasn't him because he was trying to kill [Mendez], and that's exactly what he did.

"You cannot create a situation and then claim self-defense. You cannot go to someone else's house, shoot them and then claim that they attacked you when you force your way in. You are the whole reason why you were shot. You are the whole reason why the person that is dead on the ground is dead."

Finally, as to the law on imperfect self-defense, the prosecutor argued the following during her closing argument:

"Now, the other theory of voluntary manslaughter is imperfect self-defense. And in this case you have to have—the defendant had to believe in imminent danger and believe immediate use of force is necessary to defend against that danger. So everything that we had in self-defense, but one of those has to be unreasonable. But if both of them are unreasonable, then neither voluntary manslaughter or self-defense apply. You're back to murder. Because that's the intent to kill so we know this doesn't apply."

### 2.    *Applicable Law*

Prosecutorial misconduct exists "'under state law only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'""

(*People v. Earp* (1999) 20 Cal.4th 826, 858.)  In more extreme cases, a prosecutor's improper remarks "'"'"infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citations.]'"  (*Ibid*.)  For example, it is prosecutorial misconduct to misstate the law (*People v. Cortez* (2016) 63 Cal.4th 101, 130), and to misstate the evidence or go beyond the record (*People v. Gonzales* (2011) 51 Cal.4th 894, 947; *People v. Davis* (2005) 36 Cal.4th 510, 550).  However, the prosecution "enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom."  (*People v. Hamilton* (2009) 45 Cal.4th 863, 928; see *People v. Rowland* (1992) 4 Cal.4th 238, 277 ["hyperbolic and tendentious" comments, even if "harsh and unbecoming," may be reasonable if they can be inferred from the evidence].)

### 3. *Analysis*

#### a. The Prosecutor's Comments Regarding "Provocation"

First, defendant argues the prosecutor committed misconduct when she stated during her closing argument that "[t]he provocation has to happen immediately before" the homicide and that "we can't think about maybe it was something that was said on the phone call, because that's not adequate.  That's remote provocation.  That's too far away.  That was an hour earlier.  And words don't justify the use of deadly force anyway."  Specifically, defendant argues trial counsel should have objected to these improper comments because provocation "may be physical or verbal, and it may be comprised of a single incident or numerous incidents over a period of time," and that "[i]t is also not necessary for the provocation to occur immediately before the defendant's response thereto."  (Italics omitted.)  However, even if we assume these comments were improper, trial counsel may have decided not to object because:  (1) he reasonably believed these isolated comments did not constitute prosecutorial misconduct (see *People v. Medina* (1995) 11 Cal.4th 694, 759–760 [holding that even if a prosecutor improperly appealed to

31.

"the jury's passions and prejudices," any misconduct was harmless because the prosecutor's comments were "brief and isolated"]), and/or (2) trial counsel did not want to draw the jury's attention to this potential misstatement of the law. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1290 ["[C]ounsel could also have decided that objecting would focus the jury's attention … in ways that would not be helpful to the defense"]; see also *People v. Ghent* (1987) 43 Cal.3d 739, 772–773 [holding that although defense counsel failed to object to the prosecutor's personal opinion regarding the appropriateness of the death penalty in the case, ineffective assistance of counsel was not found because "[c]ounsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments"].) In sum, trial counsel's decision to not object to the prosecutor's comments regarding provocation did not fall below an objective standard of reasonableness.

However, even if trial counsel was ineffective for failing to object to the prosecutor's comments, defendant is unable to establish he was prejudiced as a result of this failure to object. As noted *ante*, the trial court provided both CALCRIM Nos. 511 and 570 wherein it instructed the jury, "Sufficient provocation *may occur over a short or long period of time*." (Italics added.) Further, the trial court instructed the jury that "[n]othing that the attorneys say is evidence [and] [i]n their opening and closing arguments, the attorneys discuss the case, but their remarks are not evidence" (CALCRIM No. 222). Because we "presume [the jury] generally understand[s] and follow[s] the [court's] instructions" (*People v. McKinnon* (2011) 52 Cal.4th 610, 670), it is highly unlikely the jury misapplied the prosecutor's brief comments regarding provocation before finding defendant guilty of first degree murder. Therefore, trial counsel's failure to object to these comments was not prejudicial.

### b. The Prosecutor's Reliance on CALCRIM No. 3472

Second, defendant argues the prosecutor committed misconduct when "she relied on CALCRIM No. 3472[8] which was not given, but also because she failed to inform the jury about the exception for the situation where the defendant only intended to provoke a nondeadly confrontation and the victim responded with deadly force, which was previously referenced in the Bench Notes to the instruction and is now included as an optional portion of the instruction." Defendant argues trial counsel should have objected to these comments and requested a curative instruction be given to the jury.

Here, CALCRIM No. 3472 was a correct statement of the law at the time of defendant's trial in March 2022. (*People v. Enraca* (2012) 53 Cal.4th 735, 761 [approving materially identical CALJIC analog to CALCRIM No. 3472]; *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333–1334 [holding that CALCRIM No. 3472 is "a correct statement of law" under *Enraca*].) With that being said, the *Eulian* court also indicated CALCRIM No. 3472 "might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*Eulian*, at p. 1334.) Eventually, as noted above, in September 2022, CALCRIM No. 3472 was modified to address the *Eulian* court's concern. Defendant argues that trial counsel was ineffective for failing to object to the prosecutor's reference to this instruction without also providing the jury with this newly added bracketed language. However, at the time of defendant's trial, CALCRIM No. 3472 was a correct

---

[8]CALCRIM No. 3472 states the following:

"A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

In September 2022, CALCRIM No. 3472 was modified to include a bracketed second sentence for use only in such cases as follows:

"[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting.]"

33.

statement of law, and in the context of a change of a law, "defense counsel could not reasonably have been expected to anticipate [a] change in the law." (*People v. Harris* (2013) 57 Cal.4th 804, 840.) While a skilled attorney may craft an argument anticipating a change in the law, "it was not objectively unreasonable within the meaning of *Strickland* for … trial counsel to fail to predict" a change in the law. (*Larrea v. Bennett* (2d Cir. 2004) 368 F.3d 179, 184.) Therefore, a failure to anticipate changes in the law is not generally considered ineffective assistance of counsel. (See *Green v. Johnson* (5th Cir. 1997) 116 F.3d 1115, 1125 [holding that "there is no general duty on the part of defense counsel to anticipate changes in the law"]; *Alcorn v. Smith* (6th Cir. 1986) 781 F.2d 58, 62 [holding that "nonegregious errors such as failure to perceive or anticipate a change in the law … generally cannot be considered ineffective assistance of counsel"].) In sum, trial counsel's decision not to object to the prosecutor's reference to CALCRIM No. 3472 did not fall below an objective standard of reasonableness.

However, even if trial counsel was ineffective for failing to object to the prosecutor's reference to CALCRIM No. 3472, defendant is unable to establish he was prejudiced as a result of this failure to object. As we discussed in part I of the Discussion, *ante*, defendant used deadly force when he forced his way into Mendez's room while holding a loaded handgun. Defendant's act of engaging in "deadly force" made CALCRIM No. 3472's bracketed language inapplicable to this case. Therefore, even if trial counsel had objected and requested the trial court provide the jury with this bracketed language, it is not reasonably probable the trial court would have agreed to provide this bracketed language, and it was not reasonably probable the jury would have reached a different conclusion even if it was provided this further instruction. (*Strickland*, 466 U.S. at pp. 687–688, 694.) Accordingly, defendant was not prejudiced.

### c.    The Prosecutor's Comments Regarding the Law on Imperfect Self-defense

Lastly, defendant argues he received ineffective assistance of counsel when his trial counsel failed to object to the prosecutor's improper statement during her closing argument regarding the law on imperfect self-defense.  Specifically, as it related to imperfect self-defense, the prosecutor argued the following during her closing argument: "So everything that we had in self-defense, but one of those has to be unreasonable.  *But if both of them are unreasonable*, *then neither voluntary manslaughter or self-defense apply.  You're back to murder*."  (Italics added.)

As both parties agree, the prosecutor's argument is contrary to the language of CALCRIM No. 571 provided to the jury.  The trial court correctly instructed the jury that a "defendant acted in imperfect self-defense if:  [¶] [t]he defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] [t]he defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] *[A]t least one of those beliefs was unreasonable*."  (Italics added.)  Although we agree this statement was improper, we are unable to conclude trial counsel's performance fell below an objective standard of reasonableness when he decided not to object to this statement.

Similar to our conclusion above (see pt. III.C.3.a of the Discussion, *ante*), trial counsel may have decided not to object because:  (1) he reasonably believed this brief statement by itself did not constitute prosecutorial misconduct, especially considering the prosecutor immediately directed the jury to the trial court's instructions regarding CALCRIM No. 571 (see *People v. Centeno* (2014) 60 Cal.4th 659, 676 ["'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." [Citation.]'"];  and/or (2) he

35.

did not want to draw the jury's attention to this potential misstatement of the law. (See *People v. Harris*, *supra*, 43 Cal.4th at p. 1290; see also *People v. Ghent*, *supra*, 43 Cal.3d at pp. 772–773.) In sum, trial counsel's decision to not object to the prosecutor's misstatement of the law regarding the law of imperfect self-defense did not fall below an objective standard of reasonableness.

However, even if trial counsel was ineffective for failing to object to the prosecutor's misstatement of the law, defendant is unable to establish he was prejudiced thereby. As noted above, immediately after the prosecutor made these improper comments, she referred the jurors to a presentation slide wherein the correct language of CALCRIM No. 571 was on full display for the entire jury, and then told the jury, "You guys will have this in the jury deliberation room[,] [b]ut I wanted to put it up here so you can see it and write the number down if you wanted." Further, the trial court correctly instructed the jury on voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571), and we presume the jury correctly followed the trial court's instructions. (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 670.) Because the prosecutor directed the jury to the correct language of CALCRIM No. 571, coupled with the trial court correctly instructing the jury regarding the law on imperfect self-defense, we are unable to say that trial counsel's failure to object to the prosecutor's misstatement of the law was prejudicial.

## IV. Cumulative Prejudice

Defendant further contends he was prejudiced by the cumulative effect of the alleged errors. Under the cumulative error doctrine, "the cumulative effect of several trial errors may be prejudicial even if they would not be prejudicial when considered individually." (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1019.) "We have concluded that only one of [defendant's] asserted claims of error has merit, and … [w]e conclude that his other claims of error are without merit." (*People v. Woods* (2015) 241

36.

Cal.App.4th 461, 489.) "As a result, there are no additional errors as to which the cumulative effect would require reversal of any … counts." (*Ibid*.)

## V. Section 654 Does Not Apply to Count II

Finally, defendant contends "the trial court imposed an unauthorized sentence by failing to stay the sentence on either count [I] or [II] pursuant to section 654 because based on the verdicts and the prosecutor's theory of the case, it is evident the jury found the murder was the intended offense underlying the burglary, and thus both offenses were committed pursuant to a single intent and objective." We conclude the trial court properly imposed a concurrent term for count II because multiple victims existed apart from the murder victim Mendez.

### A. Additional Factual Background

On May 23, 2022, at defendant's sentencing hearing, the trial court stated the following:

> "I am aware that I do have discretion to strike the strike prior, the (a) prior, and the gun enhancement prior. And in light of the circumstances of this case, the fact that there were two—[Mendez] had two younger brothers present in this room that was not very large, they were present when [Mendez] was shot and killed, to mitigate against any reason to strike the strike prior or the gun enhancement.

> "I obviously never had a chance to meet [Mendez], but from what I have heard from people that have discussed him and what he was like, I think it's going to leave a big hole in his family, [defendant]. And I don't know what it was that led to all this happening, but a lot of good was told to me today about him, that he was willing to give the shirt off his back to help someone else out. And you were his friend and had been there previously. There was testimony about that. That this is not a stranger situation. And I know there was testimony during the trial there was a lengthy telephone conversation between the two of you, and it was pretty clear that he had an idea you were coming when he told his younger brothers to hide, to go back into the house, because he heard the gate open.

> "And obviously this is going to leave a big hole in their lives. It is obviously going to affect your family because you are going to be locked

up a long time.  I hope you take advantage of whatever programs might be available for you in state prison and that you do think about this for the rest of your life.  And as his cousin said, he hopes that you have guilt for the rest of your life about what happened and you think about this daily.

"I think that the fact that [defendant] was on parole and this involved a serious use of violence and the firearm all are aggravating factors.  And in light of the sentencing was very violent conduct under Rule 4.441, increasing seriousness of [defendant's] adult convictions, Rule 4.421(b)(2).  It was indicated in your 4.421(b)(4).  And his probation [*sic*] on probation and parole was unsatisfactorily [*sic*] under Rule 4.421(b)(5).  And the victim in this case was particularly vulnerable having been shot in his own home.

"So what I'm going to do at this point, I'm going to deny probation in this matter.  I will sentence [defendant] to the term of 25 years to life in the state prison for Count I, first-degree murder.  That will be doubled due to the strike prior, for a total of 50 years to life.  Plus an additional 25 years to life for the [section] 12022.53(d), as in David.  [¶] … [¶]

"… With respect to the [section] 667(a) prior, I am going to exercise my discretion to strike that since that prior—although the Court does have the authority to add an additional five years for that conviction, that conviction was used to elevate or double the sentence on the homicide count.  So the total commitment for Count I will be 25 years to life times two, plus 25 years to life with a gun enhancement.

"I will strike the [section] 667(a) enhancement and not impose the additional five years that could be imposed for that.

"And with respect to the burglary count, which is Count II, I will sentence [defendant] to concurrent sentence for Count II.

"If the Court of Appeal determines that it should have not run concurrent, it would be my intent to run them—stay them pursuant to section 654.  And that would be for Count II for four years, which is the midterm, times two, for eight years.

"I will strike the [section] 667(a) prior with respect to Count II as well.  And for the gun enhancement, impose the midterm of four years, doubled due to the strike prior, which would be an additional eight years consecutive.

"So total commit for Count II will be 16 years to run concurrent or stayed pursuant to [section] 654...."

Subsequently, on July 11, 2022, the trial court conducted a resentencing hearing based on an error it realized after the fact. Specifically, the following relevant exchange occurred between the trial court and trial counsel:

"THE COURT: Okay. I think that, in light of the circumstances of this case, and the fact that [defendant] does have a prior criminal history and was on release at the time that this occurred, the Court did acknowledge that it had the authority to strike the firearm enhancement at the last hearing. I declined to do that, based on those circumstances.

"But I did make an error in terms of the sentencing for Count [II]. I ordered that they were stayed, pursuant to [section] 654. I sentenced him to the midterm of four years times two on the specific charge, and then the midterm on the gun enhancement times two because of the strike prior. And that second part of the sentence was unlawful, so my intended decision will be to affirm the four times two for Count [II] and then add four years for the gun enhancement and not double that. [¶] ... [¶]

"[TRIAL COUNSEL]: ... And I think, under the new changes to [section] 1385, the Court should use its discretion to limit the entire case to 25 years to life.

"THE COURT: Okay. That request will be denied, but I will modify the sentence. It will be 12 years stayed for Count [II], four times two plus four for the firearms. And there's already been a notice of appeal, so the Court will issue an amended abstract of judgment reflecting the change in the disposition today."

Later that same day, the trial court recalled the case to provide clarification regarding its earlier sentence. Specifically, the trial court stated the following:

"But I just wanted to clarify with respect to Count [II]—I think I said this morning that I was going to stay them, the sentence, pursuant to ... [s]ection 654. And what I did previously was run them concurrent. And then I said in the event that the court of appeal determines that that's not appropriate, I would stay that under ... [s]ection 654. So that should not change anything other than the length of the sentence, which I did previously today. That was on Count [II], which was run concurrently, so that would be 12 years instead of 16 years."

39.

Both the abstract of judgment and the July 11, 2022, minute order reflect the trial court's imposition of a concurrent 12-year term on count II.

## B. Applicable Law

Section 654 provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642.) Determining "[w]hether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry …. We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether the course of conduct reflects a single "'intent and objective'" or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311) "If all of the offenses are incident to one objective, the court may punish the defendant for any one of the offenses, but not more than one. [Citation.] If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267–268.) However, this two-step inquiry is not required "where "'one act has two results each of which is an act of violence against the person of a separate individual.'"" (*People v. Correa* (2012) 54 Cal.4th 331, 341, fn. 10.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) Under substantial evidence review, we review the evidence in the light most favorable to the judgment and presume the existence of every fact that could reasonably be deduced from the evidence. (*People v. Cleveland*, *supra*, 87 Cal.App.4th at p. 271.) We "affirm the trial court's ruling, if it is supported by substantial evidence, on any valid ground." (*People v. Capistrano* (2014) 59 Cal.4th 830, 886, fn. 14, overruled in part on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104.)

### C.  Analysis

Even assuming defendant only possessed a single intent and objective in committing both the burglary and murder, we find section 654 inapplicable in this case based on the "multiple victim" exception. (*People v. Correa*, *supra*, 54 Cal.4th at p. 341 & fn. 10.) "[O]rdinarily, if the defendant commits both burglary and the underlying intended felony, … section 654 will permit punishment for one or the other but not for both." (*People v. Centers* (1999) 73 Cal.App.4th 84, 98–99 (*Centers*).) For example, a defendant who enters a residence in order to commit an assault has a single intent and objective and may not receive punishment for both the burglary and the assault. But under the multiple victim exception to section 654, "'"even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim." [Citations.] The reason for the multiple victim exception is that "when a defendant '"commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons," his greater culpability precludes application of section 654.'" [Citation.]'" (*Centers*, at p. 99.) "[B]urglary is a violent crime for

41.

purposes of the 'multiple victim' exception when the jury finds that, in the commission of the burglary, the defendant personally used a firearm." (*Id*. at p. 88.)

We find *Centers* instructive. In *Centers*, the defendant, while holding a gun, entered a house occupied by three individuals and kidnapped one of these individuals. (*Centers*, *supra*, 73 Cal.App.4th at pp. 88–90.) The jury convicted defendant of kidnapping, and of a single count of burglary with a firearm use enhancement (§ 12022.5, subd. (a)). (*Centers*, at p. 90.) The court noted that neither the information nor the verdicts specified a particular victim of the burglary and its firearm use enhancement (*id*. at pp. 100–101), and in that circumstance "the trial court is entitled to make any necessary factual findings *not already made by the jury*." (*Id*. at p. 101, italics added.) Specifically, *Centers* correctly pointed out "a number of cases have upheld the application of the multiple victim exception based on evidence of multiple victims, without considering whether the identities of those victims had been pleaded." (*Ibid*., citing *People v. Cruz* (1995) 38 Cal.App.4th 427, 434–435; *People v. Gutierrez* (1992) 10 Cal.App.4th 1729, 1736–1737.) Thus, the trial court "could properly find multiple victims" (a finding for which there was substantial evidence) and impose punishment for the burglary and enhancement in connection with one of the occupants of the apartment as well as the kidnapping of the other. (*Centers*, *supra*, at p. 101.)

Overall, "in the absence of some circumstance 'foreclosing' its sentencing discretion …, a trial court may base its decision under section 654 on any of the facts that are in evidence at trial, without regard to the verdicts." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340, italics omitted.) This is a "reasoned conclusion [because] [a]fter all, a court may even rely on facts underlying verdicts of acquittal in making sentencing choices."[9] (*Ibid*., italics omitted.)

---

[9]Defendant focuses a significant portion of his argument on the trial court's improper reliance on *People v. Coelho* (2001) 89 Cal.App.4th 861 in making its determination that section 654 did not apply. In *Coelho*, the court developed a methodology for identifying the factual

Here, there is at least one victim of the burglary and firearm enhancement (i.e., C.R.) who was not also a victim of the murder. Although the first amended information did not identify C.R. as a potential burglary victim, he undoubtedly was a victim of the burglary because he lived in and was present at the Larkin Avenue residence during the offense. (*Centers*, *supra*, 73 Cal.App.4th at pp. 100–101; see *People v. Davis* (1998) 18 Cal.4th 712, 720–722 [holding that the burglary statute protects an occupant's possessory interest in the building].) Specifically, the jury found true that (1) defendant "did willfully, unlawfully, and feloniously enter the inhabited dwelling, *occupied by another*, to wit, [the Larkin Avenue residence] … with the intent then and there and therein to commit theft or any other felony offense"; (2) the burglary was a violent felony because "during the commission of said offense, another person other than an accomplice, was present in the residence, within the meaning of … [s]ection 667.5(c)(21)[10]"; and (3) "[d]uring the commission of the above said offense, *defendant personally used a firearm*, in violation of [s]ection 12022.5(a) …." (Italics added.) As in *Centers*, the trial court's implicit finding of multiple victims is supported by substantial evidence. The evidence supports the implicit finding the occupants of the house (including C.R.) were all victims of the offense and firearm enhancement charged in count II because there was ample testimony that an adult and several children were in the house at the time of the burglary.

basis for a verdict in the context of determining whether a recidivist provision for mandatory consecutive sentences was applicable. (*Coelho*, at pp. 879–884.) *Coelho* is premised on a defendant's right under the federal Constitution to a jury trial, concluding as a result that a sentencing court can rely *only* on facts that are the basis for the jury's verdict. (*Coelho*, at p. 876.) As the right does *not* apply to statutes that mitigate punishment, such as section 654 (*People v. Cleveland*, *supra*, 87 Cal.App.4th at pp. 269–271), we agree with defendant that *Coelho* is not relevant to this present analysis. Nonetheless, as we discuss in detail below, the trial court properly exercised its discretion in sentencing defendant to a concurrent sentence on count II.

[10]Section 667.5, subdivision (c) provides: "For the purpose of this section, 'violent felony' means any of the following: [¶] … [¶] (21) Any burglary of the first degree, as defined in subdivision (a) of Section 460, wherein it is charged and proved that another person, other than an accomplice, was present in the residence during the commission of the burglary."

43.

Therefore, although the first amended information did not specifically allege the identities of the victims in the house, nor did the jury make any explicit findings regarding the victims of count II, it was proper for the trial court to impose a concurrent term because multiple victims existed apart from the murder victim Mendez.

## DISPOSITION

For the foregoing reasons, the judgment is affirmed.


PEÑA, Acting P. J.

WE CONCUR:


MEEHAN, J.


SNAUFFER, J.